UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

Jane Doe One, Jane Doe Two,  )  File No. 24-cv-1570
Jane Doe Three, Jane Doe Four,  )  (JWB/DTS)
and Jane Doe Five,  )
)
        Plaintiffs,  )  St. Paul, Minnesota
)  January 22, 2025
vs.  )  2:02 p.m.
)
The Nature Conservancy;  )
Douglas Shaw; and Does 1  )
through 30, inclusive,  )
)
        Defendants.  )

------------------------------------------------------------

**BEFORE THE HONORABLE JERRY W. BLACKWELL
UNITED STATES DISTRICT COURT JUDGE**

**(MOTION HEARING)**

Proceedings recorded by mechanical stenography;
transcript produced by computer.

ERIN D. DROST, RMR-CRR
(651) 848-1227

APPEARANCES

For the Plaintiffs:      Lawless, Lawless & McGrath
EMILY MCGRATH, ESQ.
THERESE MARIE LAWLESS, ESQ.
354 Pine Street, Fourth Floor
San Francisco, California 94104

MSB Employment Justice LLP
CHRISTOPHER J. MORELAND, ESQ.
6400 Flying Cloud Drive
Suite 215
Minneapolis, Minnesota 55344

For the Defendant The      Stinson, Leonard, Street, LLP
Nature Conservancy:      TRACEY HOLMES DONESKY, ESQ.
50 South Sixth Street
Suite 2600
Minneapolis, Minnesota 55402

For the Defendant      Nilan Johnson Lewis PA
Douglas Shaw:      SARA LEWENSTEIN, ESQ.
250 Marquette Avenue South
Suite 800
Minneapolis, Minnesota 55402

Court Reporter:      ERIN D. DROST RMR-CRR
Suite 146
316 North Robert Street
St. Paul, Minnesota 55101

# P R O C E E D I N G S

## IN OPEN COURT

THE COURT: Would you please call the case.

THE COURTROOM DEPUTY: We are here on the matter of Jane Doe One, et al., v. Nature Conservancy, et al. Case Number 24-cv-1570 JWB/SGE.

THE COURT: All right. Can we have the parties note their appearances starting with plaintiffs' counsel?

MS. LAWLESS: Therese Lawless on behalf of the plaintiffs, Your Honor.

THE COURT: All the plaintiffs?

MS. LAWLESS: Yes, Your Honor.

THE COURT: All right.

MS. MCGRATH: Good afternoon.

Good afternoon. I'm Emily McGrath on behalf of all the plaintiffs as well.

THE COURT: All right. Good morning -- good afternoon I guess to you both.

MR. MORELAND: Good afternoon, Your Honor. Chris Moreland on behalf of the plaintiffs as well.

THE COURT: All right. Good afternoon.

MS. DONESKY: Good afternoon, Your Honor. Tracey Donesky on behalf of The Nature Conservancy.

THE COURT: Good afternoon.

MS. LEWENSTEIN: Good afternoon. Sara Lewenstein on behalf of Defendant Douglas Shaw.

THE COURT: Good afternoon as well.

We're here on motions to dismiss. We will hear argument on all the bases for the motions. There will be more argument with respect to some than others as we're previewing how this may go today. So I'm just going to take them in order.

There may be some of the motions -- there will be some of the motions where I don't really have a need to hear from the plaintiffs at all on them. If you find that you're well ahead and you want to come up to the podium and say something anyway, do so at your peril, but do so.

So why don't we start with the Counts I and II. I'll start with TNC's motion to begin with, and I'll put together Counts I and II on the Title VII and MHRA. And let me hear, you know, five minutes' worth of that argument.

MS. DONESKY: Certainly, Your Honor. Thank you.

THE COURT: And let me tell you, too, I'll refer to -- at least for this hearing, to the plaintiffs still with their Jane Doe numbers just because that's the way I have learned them. Going forward prospectively, I'll use the names consistent with the MJ's ruling on that issue.

Please proceed.

MS. DONESKY: Thank you, Your Honor. And I don't

know if this is helpful for Your Honor, we -- amongst us, we spoke and conferred before today on how we would divide up the arguments for Your Honor for efficiency purposes and hopefully to avoid a lot of repetition.

For our purposes for TNC, we -- I was going to handle the vicarious liability and the employment claims as you've asked me to do on these counts as well, and Mr. Shaw's counsel would address the merits arguments of the tort -- intentional and negligent tort claims.

So -- and I believe the plaintiffs' counsel -- we spoke with them -- they have divided it up similarly, so just wanted to give you that preview.

THE COURT:  Sure.  That will be fine.  I'm going to take them count by count, and we'll get to the intentional ones toward the end anyway.

MS. DONESKY:  Sure.

Well, let me begin then.  Counts I and II would be -- let me just make sure, because I -- there are --

THE COURT:  Sexual harassment, the hostile work --

MS. DONESKY:  It's harassment, right.  I think of I and II as Title VII and MHRA hostile work environment. Counts III and IV are the disparate treatment claims.

So we packaged the Counts I and II.  There are several plaintiffs for various reasons why their claims fail.  So in the first instance, Counts I and II on the

harassment claim for Ms. Brandon, who is JD2, her --

THE COURT:  These claims related to JD2 and JD5.

MS. DONESKY:  Yes.  Well, JD2, if it helps Your Honor, all of her employment claims, Counts I through IV, actually, are all legally barred because her claims are time barred.

JD2 left TNC in February of 2020.  While she asserts Counts I and II, as well as III and IV, no matter whether they are harassment claims or disparate treatment claims, they are all time barred.  And the reason is because under Title VII, she had 300 days to file her claim post-February of 2020, and she had a year to do so under the MHRA.

However, she did not file the charge until July 10 of 2023, over three years post her departure from TNC where she elected to leave the company.  And it's really that plain and simple of a time barred claim.

I know the plaintiff had made a couple arguments as to continuing violation doctrine.  That doesn't apply to the disparate treatment claims, which I know are Counts III and IV.  But as to Counts I and II for JD2, those are inapplicable because the only allegation that Ms. -- JD2 is seeking to hook her claim, to make it not time barred, is an action that took place in -- shortly after the discovery of the photos in roughly late September, early October of 2022.

But it's undisputed, Your Honor, she was not an employee of TNC at that point. And case law is clear that you can't create a continuing hostile work environment legally once you are not an employee of the company. So because she had not been an employee since 2020, there was no basis for which she can rely on any post-employment actions, and that's the only basis she has to try to save her claim. And that legally, just as a matter of law, doesn't apply.

A quote from the *Abdullah* case is directly on point. Quote, Plaintiff contends that events that occurred after she resigned from her position support a finding of a continuing hostile environment by the Census Bureau. However, Courts have found that events that occur after an employee leaves her position cannot be used to support a claim for a hostile work environment. (Plaintiff cannot use events that happened after the termination to support his hostile work environment.) The conduct is actionable under that theory if it alters the terms or conditions of an employment. If the plaintiff's employment has been terminated by the time that action took place, there were no terms or conditions to employment to alter.

So really for JD2, that's the legal reason why her Counts I and II, as Your Honor has asked me to address, fail legally. And I would say to avoid having to repeat the same

arguments for III and IV for JD2, that's the same failing. It's the same legal failing.

Now for JD5 -- we also moved on the hostile work environment for JD5, Ms. Jones. By way of context and background, Ms. Jones worked at TNC as a senior digital marketing strategist and conservation writer. Her claims, as Your Honor has asked, for Counts I and II legally fail because she's unable to plausibly -- she has not plausibly alleged allegations of severe or pervasive environment because of her gender.

Her claim, Your Honor, consists of just three allegations, none of which are gender based. She quarrels, for instance, with an innocuous photo of her posted on the Flickr website, but admits, in the footnote of her complaint, that it was not sexually explicit.

She quarrels with an e-mail that TNC sent around to staff after the discovery of Mr. Shaw's photo misconduct was discovered. That e-mail nowhere mentions Ms. Jones by name or in any way specifically.

And then lastly, TNC -- she takes issue with the fact TNC asked her to do her job. And that's specifically that TNC asked her to review TNC's publicly facing website to ensure Shaw's name nowhere appeared on it. To be clear, the ask was never to go on to the Flickr website that was Mr. Shaw's site at all or to view any kind of photos,

sexually or otherwise. There's no allegation of that in the complaint as well.

And I would submit the *Apex* [sic] case is Judge Tunheim. He dismissed a hostile work environment claim on a motion to dismiss, just like we've moved here, on arguably stronger facts for the plaintiff in that case with actual gender and race-based comments that were made. He found those complaint allegations insufficient and dismissed as a matter of law on those. And so that would be the grounds for the JD5 motion to dismiss Counts I and II.

THE COURT: All right. Let me hear from the plaintiff.

MS. DONESKY: Yes. Thank you.

MS. MCGRATH: Thank you very much, Your Honor. With respect to the harassment claims for JD2, who is Andrea, the first basis that we discussed was the continuing violation doctrine. And I know you've already read all the papers, so I just wanted to address the authority that my opposing counsel has put in their reply papers.

In order to argue that the continuing violation doctrine should not apply because this final act that falls within the 300-day window before the EEOC complaint was filed was -- was -- indeed did occur after Ms. Brandon's employment had -- I'm sorry -- Jane Doe Two's employment had ended, they rely on three cases primarily.

The first is from the Eighth Circuit, *Rester*. And just very briefly, what happened was that on one particular day, an employee was assaulted by her supervisor. And there was -- the Court held that that was not motivated by sex. The one alleged incident of assault meant that the acts did not permeate the workplace, and they also held that, you know, there was no constructive discharge. There was no discussion in that case of post-employment conduct being considered as a part of a hostile work environment. I point to that only to say that they've cited a case that does not address the issue and does not support their -- their position.

There's also a string cite of cases out of different geographical areas, different circuits, different districts. And, once again, those cases born out of the Eleventh Circuit never addresses anything about the continuing violation doctrine. It does make a mention of equitable tolling, but we can discuss that in a moment.

In *Velez*, which is a Southern District of New York case, all of the acts at issue occurred post-termination, which of course is a very different posture than what we have here. And in *Purcell*, which was the Western District of North Carolina, again, the continuing violation doctrine is never mentioned in that case. Those cases don't support.

I do concede that in -- in the *Abdullah* case,

which is out of the Southern District of Texas, it does have the language that Ms. Donesky cited. And I think what I would say is that as a matter of logic, it does make some sense that for a work environment to be hostile, an employee would have to be employed at that work. And so I understand their argument.

But I just wanted to call to the Court's attention that there is no controlling authority that definitively states that, you know, one act could not occur post-employment.

THE COURT: So what's your position on whether it's timely or untimely? If it appeals to logic that there can't be a claim for harm post-employment, then were the charges filed late or not?

MS. MCGRATH: Well, I wouldn't say that the charges were filed late because -- I would say it makes sense that equitable tolling might not be applied to this particular hostile work environment claim. I do not concede any point, though, however, on the employment claims of employment discrimination. But you haven't asked me to address that right now, so I will stop there.

With respect to Jane Doe Number Five, the standard there is -- talks about a workplace that is, you know, permeated with intimidation, ridicule, and insult.

THE COURT: Go back to JD2 for a second --

MS. MCGRATH: Sorry.

THE COURT: -- just to make it plain for me. Are you saying that the continuing violation doctrine does or does not apply to JD2?

MS. MCGRATH: Well, what I'm saying is just that there is no controlling authority that says that it cannot apply. I mean, I agree that they have found a couple of, you know, District Court cases in entirely different areas; but, I mean, there is no controlling authority saying that it cannot apply.

I will concede, though, that it does make some logical sense that maybe she could not be subjected to a hostile work environment when she was no longer, in fact, employed.

THE COURT: So then are you conceding the dismissal of these claims as to JD2 if there is no continuing violation doctrine, or are you relying on equitable tolling in this context after all?

MS. MCGRATH: I am relying on equitable tolling, Your Honor, yes.

THE COURT: With respect to Counts I and II?

MS. MCGRATH: Your Honor, I do concede that for Claims I and II, the sex harassment, specifically, I think they are time barred for JD2.

THE COURT: All right. Okay. Please proceed.

MS. MCGRATH: Okay. Jane Doe Five, her hostile work environment, again, I know that you've read the briefs. In the reply, there's one further point of authority that defendants have cited. It's the *Fergus* case out of Minnesota in 2022. And I just would like to compare and contrast briefly. In that case, it was found that, you know, the workplace was not permeated with intimidation, ridicule and insult because the only allegations were that a subordinate of Fergus had raised his voice repeatedly. But there was never any allegation about what had been said or how often that was. And that -- that several coworkers were overly critical, but, again, no explanation of what was said that was overly critical or anything of the sort. And in that case, the Court sort of summed it up as that could be dismissed -- the hostile work environment claim could be dismissed because they were offhand comments and isolated incidents.

And I would posit to you, Your Honor, that I think what we have here is a very different scenario where with all due respect, it is very intimidating and insulting for a young woman who has been displayed amidst all this sexually explicit conduct, which we've pleaded at paragraphs 10, 20, and 32, she's featured amongst all this content, to then be asked to be the one who scours all of the defendants' website and social media sites to remove -- to help sort of

cover up the fact that there was ever any link between Defendant TNC and Defendant Shaw and to scrub the content thereafter.

I mean, we did plead, remember, that the hostility -- this is at paragraph 10 -- was so intolerable that it interfered with her ability to perform her work and she was forced to take a leave. And furthermore, you know, after the discovery -- after Jane Doe Five discovered this content, there was the e-mail blast -- right? -- from the chapter director which essentially sort of pointed all of her coworkers to go look at this lewd content, again, which she's featured amongst.

And then in paragraphs 41 through 43, we talk about sort of the ensuing failure to take any appropriate action on TNC's behalf, which included, of course, you know, accusing women of being combative and accusatory when they brought to light the fact that previous complaints about this individual defendant had gone unheeded. Asking them to be respectful and calm when they, you know, understandably got upset when describing this.

So I think it's more of a factual situation; and, again, I would just submit that a motion to dismiss is not the appropriate time to suss through all of the detailed facts, and that this should be allowed to proceed.

Predominantly, these cases are motion for summary

judgment cases that have been cited by defense. And that's all, Your Honor.

THE COURT: Now, I put together Counts I and II, Title VII and MHRA. Do you have different arguments with respect to either JD2 and JD5 for the MHRA?

MS. MCGRATH: I do not, Your Honor. Thank you.

THE COURT: All right. Thank you. That will be sufficient.

Court will deny the motion to dismiss as to Counts I and II in Plaintiff JD5. The complaint has facts about the negative work environment for JD5 and how it affected her. They pled sufficient facts for a plausible hostile work environment claim, at least to proceed forward to discovery, and then we will see where we are at summary judgment.

So let's turn to Counts III and IV, sex discrimination and disparate treatments.

MS. DONESKY: Thank you, Your Honor. For a point of clarity, would it be fair that the JD2 is granted given the concession from the plaintiffs for Counts I and II?

THE COURT: Yes.

MS. DONESKY: So that will be granted as to JD2 on I and II. Okay.

THE COURT: Yes.

MS. DONESKY: Okay. Thank you.

For purposes of Counts III and IV, the same arguments as to JD2 exists that I already spoke of earlier --

THE COURT:  With respect to the time limits?

MS. DONESKY:  Correct.  Same argument.  Same problems with both continuing violation reliance as well as equitable estoppel -- or equitable tolling.  There's no evidence that she was unaware or lulled into any facts that she wasn't aware of.  And continuing violation, again, it's -- the last adverse action was the day she left in 2020.  So, yeah, the same arguments would apply for JD2.

As to Counts III and IV for -- we have different grounds here for JD3 on Counts III and IV, the disparate treatment claims.  And the legal failure here is the failure to plead an adverse action.  Ms. Busse, JD3, is still employed at TNC to this day.  There is -- there is no allegation pled of any adverse action.  And by that simple fact and legal deficiency, it would fail as a matter of law.

Now, the plaintiff seems to allude in their response to some type of vague, unspecified claim of maybe a lack of a grade recognition of some point; but even if that were the case, it has no date, it has no explanation of whether it was time barred, and I would submit, Your Honor, it is time barred because that wasn't raised in her administrative charge.  We're well beyond from 2020, and

we're talking a grade recognition. Even prior to that date, it would even be more time barred than the termination -- not termination -- but the departure, her resignation date. So the attempt to bring in some other different type of purported adverse action simply fails. So that would be the basis for dismissal of JD3's Count III and IV.

THE COURT: I mean, obviously you all had a -- an exchange and a dispute over the -- call it the *Flournoy* case, or however it's pronounced -- that went to the issue of whether a date is required to have been pled. *Flournoy,* F-l-o-u-r-n-o-y.

MS. DONESKY: Yes. Well, yeah, I mean, for purposes of pleading a plausible allegation and knowing whether it's legally plausible or not, certainly a date would be necessary to know the time. But by logic, if we're going to use logic again here, it, by nature --

THE COURT: We are not. We're not going to be illogical but --

MS. DONESKY: Okay.

THE COURT: -- it's not going to become legal authority.

MS. DONESKY: Sure.

Ms. Jones, who is JD5, her Counts III and IV, both Title VII and MHRA, fail, again, also --

THE COURT: Let me just say even before you go on

to JD5 --

MS. DONESKY: Certainly.

THE COURT: -- I will hear from the plaintiff --

MS. DONESKY: Okay.

THE COURT: -- with respect to JD2 -- but don't go away. Don't go away.

MS. DONESKY: Okay.

THE COURT: But I won't need to hear argument on JD3. I'll deny that particular claim. I did look at the case law that you cited. I see that JD3 alleged that she was denied appropriate job grade recognitions and promotions. As you say, that JD3 didn't say when that occurred.

But as I looked at the *Scheer* case, S-c-h-e-e-r, which the defendants also cited, I read the language, "To satisfy Rule 8 pleading standards, discrimination and retaliation claims need not identify offending individuals by their full names, nor do such claims require exact dates of conduct."

And so I'm going to allow that to proceed forward for discovery of further facts, and, again, I'll see what has evolved by the time of summary judgment.

So with that, if you'd proceed to JD5.

MS. DONESKY: Certainly. JD5 is an individual who also fails on failing to show adverse action. She

voluntarily left TNC in 2023. Pleading wise, she failed to allege constructive discharge for those allegations. And as a result, because she voluntarily left, that would be the only basis to claim any kind of adverse action, and she failed to do so.

And I don't believe it's subject to amendment to cure that error, Your Honor, because the last sort of act of any kind of intolerable action that she may even -- that even is contained in the complaint dates back five to six months earlier where she attended a retreat with TNC. So for five to six months thereafter, there aren't any allegations of any type of intolerable conditions of any kind.

There was no opportunity given first for TNC to correct any potential intolerable conditions she perceived prior to leaving, and that's required under Title VII legally, so we believe that claim fails.

And the only real response plaintiffs had was to really assert allegations that really go to Counts I and II on her hostile work environment and is really essentially stating out a duplicative claim there. So we would move for dismissal of Ms. Jones' disparate treatment claims, JD5.

THE COURT: All right. With respect to JD5, I will deny that motion also to dismiss that claim. I think the allegations at this stage are sufficient. Plaintiff

says that -- their argument is that if it's subject to hostile work environment, then that's sufficient for the adverse employment action, and that they don't need to plead further elements of constructive discharge to adequately plead sex discrimination.

So I was really focused, in reviewing my notes here, with respect to some of the case law post-*Muldrow*. And after *Muldrow*, a plaintiff is only required to plead some harm respecting an identifiable term or condition of employment. And that was the Eighth Circuit's *Cole* decision from just last year citing *Muldrow*.

The *Muldrow* decision specifically points to the *Meritor* case for the proposition that worse treatment/harm covers more than economic or tangible. *Meritor* holds that a change in the terms or conditions includes the entire spectrum of disparate treatment of men and women in employment, which could include subjection to hostile work environment.

And here plaintiffs have pled a hostile work environment claim and also pled that JD5 was asked, after it was known her images were involved in the photos that Shaw had posted, to review the entire website and social media accounts for mentions of Shaw. They allege this action caused her significant distress, resulting in her taking a leave of absence and later leaving her employment.

Those allegations are sufficient at this stage, at the motion to dismiss stage, to support plaintiffs' claim of harm. But I hasten to add the issue can be reraised at summary judgment if discovery shows that JD5 was not treated worse in terms of any employment term or condition.

And I do note that the complaint includes allegations that -- that contrary to the defense's assertion, that the complaint does contain allegations that support that TNC was given a reasonable opportunity to remedy the misconduct. That's in various places in the complaint. So I find that they have pled sufficient facts to state plausible claims.

So anything further with respect to Counts III and IV before I hear from plaintiffs on JD2?

MS. DONESKY: Nothing here, Your Honor.

THE COURT: Thank you.

MS. MCGRATH: I'm going to start with JD2. Is that okay for the --

THE COURT: In fact, that's where I -- it's more than okay.

MS. MCGRATH: Okay. Great.

So with respect to the authority brought up in the reply for defendants --

THE COURT: Would you first just give me the punch line.

MS. MCGRATH:  Sure.

THE COURT:  Because the argument here --

MS. MCGRATH:  Yes.

THE COURT:  -- is that JD2 is untimely with respect to Counts III and IV as was conceded with respect to Counts I and II.

MS. MCGRATH:  Right.  But I do not concede with respect to Counts III and IV because of the doctrine of equitable tolling which does apply to discrimination in the workplace.  And, actually, I think -- I think that defendants' authority really helps us understand why it applies here.

Three cases are cited, all of -- about this equitable tolling and/or equitable estoppel.  They are all outside the Eighth Circuit.  But *Currier* was a case in which an employee was sexually assaulted by an HR leader.  This Court discussed and applied equitable estoppel to the employee's retaliation claim, and the Court applied this equitable estoppel and extended the time frame because the defendant had taken affirmative steps to make the employee think that the final act was, in fact, not final, that his termination was not final.  That it was still being reviewed.

Similarly, in paragraphs 34 through 36 of our complaint, we have talked about the fact that TNC took

affirmative steps to and failed to tell many of the plaintiffs, including Jane Doe Two, who conspicuously was in over 300 pictures and had a multitude of comments about her on the site, they did not tell her about all of the content, they did not show her about the content after her requests. So that would fall under the bar of equitable estoppel, which there was sort of one brief reference to in our opposing papers.

I had mostly focused on equitable tolling, I will admit, which is just saying that the employee failed to discover the facts necessary to support the claim, not because of any unreasonable, you know, action on their own. They acted reasonably, they acted normally, but just through no fault of their own, they could not discover the facts.

And the defendants' reply case -- sorry. I think maybe it's helpful to come back to the authority that is on point, which is the *Dring* Eighth Circuit case from 1995 and the *Devin* District Court of Minnesota case from 2005, as well as defendants' authority, which includes *Currier*, that you can -- you are entitled to equitable estoppel and/or equitable tolling on discrimination claims. That much is clear. And JD2 should be entitled to equitable tolling or equitable estoppel for her discrimination claim because she did not discover the online discrimination which started during her employment and continued after her employment.

And she did not and could not discover that until September of 2022, which is within our time period for exhausting the administrative remedy.

And then furthermore, I just would point out that it is referenced, albeit briefly, in our opposition brief that equitable estoppel could apply too because TNC held such relevant information. Again, that's paragraphs 34 through 36.

I don't know if it's worth mentioning here, I just -- I would say that at one point in defendants' reply brief, they, for the first time, bring up a new argument. It's actually in their section about equitable tolling and equitable estoppel. They take a new position, which they have not brought up -- they did not bring up in their moving papers, that maybe Jane Doe Two's claims should be tossed because she did not suffer an adverse action.

Again, that was not a grounds for originally moving, and Your Honor just addressed that all when we discussed the *Muldrow* and post-*Muldrow* authority. She can be subjected to an adverse action simply by being subjected to harassing or discriminatory conduct.

So I think that's the end for JD2 with respect to III and --

THE COURT: All right. That was the only inquiry I had.

MS. MCGRATH: Okay.

THE COURT: And with respect to equitable tolling, I think on that grounds, at least the possibility that equitable tolling applies, I will deny that motion to dismiss.

Equitable tolling has the Court focus on whether a plaintiff's ignorance of a claim is related to the fact of with all due diligence the plaintiff is not able to obtain important and vital information that bear kind of on the claim. And I note here that with respect to JD2, the plaintiffs alleged they weren't aware of the online postings and comments at issue until late September 2022. Again, I note if discovery shows that equitable tolling isn't supported, the issue can be reraised at summary judgment.

But it will be allowed to move forward for factual development for discovery. So thank you. You can retake your seat.

MS. MCGRATH: Okay. Thank you.

THE COURT: And we'll move on to Counts V and VI, retaliation, Title VII and MHRA, and this relates to JDs 1 and 2.

MS. DONESKY: 1 and 4, I think. I think the retaliation claims are JD1 and JD4.

THE COURT: Yeah, that's right.

MS. DONESKY: Yes. Okay. So with respect to

those claims, Your Honor, JD1, her retaliation claims fail legally for at least two reasons. She did not allege engagement in legally protected activity; but moreover, she cannot legally show a causal connection between the time of that alleged protected activity and her departure.

The complaint -- you know, even assuming for purposes of brevity and given that we've briefed the issues, that even assuming the complaints in 2020 were legally protected, and that's her allegation, is throughout 2020, she made various complaints, but our position being that saying the demeaning, abusive, and so forth isn't enough. Even if you were to assume that, Your Honor, those complaints are from 2020. And she left TNC March of 2023. That is nearly a two-and-a-half-year time gap between even the last of those complaints because that could be the very last of them.

They would be even older, three and a half years, if they were complaints earlier in 2020. But giving the benefit of the doubt to the plaintiff, as we're required to do on the motion, you have a two-and-a-half-year time gap. And as a legal matter, that time gap is too attenuated as a matter of law and legally fails for that reason.

So it is -- I will note, I know in response, and I think this is -- is not an avenue the Court should follow, but they do try to direct the Court over to paragraph 41 to

an allegation in that paragraph of the complaint referring to events in November 2022.

THE COURT: I might have seen that.

MS. DONESKY: Okay.

THE COURT: The all staff retreat?

MS. DONESKY: Yeah, well, they're not in the complaint section of the complaint. They're in a totally different area. And I would submit that what is described in that paragraph 41 is not new protected activity. It's not a legal protected activity. If anything, at most, it's describing effects that Shaw's conduct had on this plaintiff.

But that, in and of itself, isn't a separate and independent report of any kind of protected activity, so it does not save her claim. It remains a two-and-a-half-year time gap at the very best. It's probably two and a half to three and a half years of a time gap, and case law would support dismissal for that reason.

THE COURT: So it's in the complaint --

MS. DONESKY: Yeah.

THE COURT: -- and it is an averment in the complaint, but you believe it shouldn't be operative because it's not in the complaint section?

MS. DONESKY: No, not only that. That's form over substance. I mean, that -- we point out that the complaints

are in one section of the complaint, and then in response to our pointing out that those complaints are so attenuated it can't plausibly create a claim, their response was to pivot over to paragraph 41 to seek to save the claim and make a new claim that paragraph 41 is somehow asserting a new type of protected activity to make it a shorter time gap to try to save the claim.

And our point is that reliance on that paragraph 41 is legally misplaced. It's not protected activity, what's described in 41. That's the argument we're making. It's -- it's not claiming that the -- by November of 2022, the discovery, which neither TNC nor plaintiffs knew of until September of 2022, but that -- had it already been discovered, all that's alleged or described in 41 is either her effects, how she felt, what she felt about it as a result of the past conduct. It's not, you know, claiming a violation of law was occurring. The type of protected activity, someone is violating a law currently and you are reporting it. That's what a whistleblower requires for protected activity.

THE COURT: Well, she says beyond that in 41 that thereafter, after that, she was excluded from meetings, development opportunities, and treated in a hostile and cold manner by managers.

MS. DONESKY: She might allege that, but the

action that she's claiming she participated in was the participation in a retreat, but what she describes is not -- her content of what she's describing is not protected activity. She's simply saying she had an adverse effect to the events that had happened previously.

THE COURT: So are you saying taking those averments in the light most favorable to the non-movant, that is the plaintiff, I should still conclude that none of that is actionable?

MS. DONESKY: That's correct, Your Honor.

THE COURT: All right. So you may ultimately be right about that, but we're going to find out at summary judgment. For motion to dismiss purposes, though, that claim will be denied.

MS. DONESKY: Okay. I assume this won't change the Court's mind, but I will only point out that in addition to the description of that November 2022 paragraph of 41, it wasn't exhausted as a claim at the administrative level. So if you -- that had to have been asserted within the time period necessary, and it -- and I would say it's time barred as well.

But if -- at this point, it has not been properly exhausted or asserted because it's, you know, a brand new argument that they have brought up. And protected activity does need to be exhausted. It's a new type of retaliation

claim. So there's also a time barred problem with her reliance on paragraph 41.

THE COURT: You're correct. That doesn't --

MS. DONESKY: Okay.

THE COURT: -- change my mind about denying that claim.

MS. DONESKY: It does not change.

THE COURT: Right. Still not changed. That's right.

MS. DONESKY: Okay. JD4 then. I wanted to make a record of it at least. And I know we can revisit it at summary judgment. Ms. -- JD4, who I'll refer to by the number as opposed to the name, her claims on the retaliation side, she claims to have engaged in protected activity timewise in June of 2022. Thereafter, she received several further positions. She then moved from policy associate to policy manager. She then again moved from policy manager to associate director. I think the Court can take judicial notice of that. It's in the complaint itself.

And that there's now a over one-year time gap between that original complaint, after which these new positions were received and given to her by TNC, only for her to leave in July of 2023 over one year later. Again, no intolerable conditions were raised at that time, therefore, unable to support a constructive discharge claim and adverse

action, and, therefore, her claim is not plausibly alleged and would fail for that reason as well.

THE COURT:  All right.  So I'm really focused on whether or not a causal link has been pled.  And not so much beyond sort of the baseline of a *Twombly-Iqbal*.  I'm not engaged beyond that and determining who has the better argument about how credible the claim is.  For motion to dismiss purposes, I'm simply trying to assess whether the claim is.

And in this case, the complaint does not allege that she was promoted, but that her role changed from policy manager to associate director in October of 2022.  And while that might weigh against a causal link, it doesn't change the fact that a causal link has been plausibly pled in the complaint.  Whether that can actually be proven I think is an issue for another day, either summary judgment or trial.  So that particular claim -- that motion to dismiss those claims are denied with respect to JD4.

MS. DONESKY:  If Your Honor would like, I could touch on -- I could then -- I think we're at Count VII through the remainder of the complaint.  If you'd like me to address the vicarious liability legal issue at this time, I'd certainly be prepared to do so.

THE COURT:  Yes.  Just one moment.

MS. DONESKY:  Sure.

THE COURT: So I was simply looking further at the pleadings. And I see here in the complaint that both JD1 and JD4 made reports of discrimination and harassment, and it was to me clear enough from the context of the allegations pled that the complaints were about gender-based discrimination. They allege that following their complaints, they were subjected to working conditions that were so intolerable that a reasonable person in their position would feel compelled to resign. They also alleged that TNC repeatedly refused to take remedial action, and the allegations support that TNC had a reasonable chance to work out the problem. They allege then that they were constructively discharged because of their complaints.

So the truth of it, I don't know. I just know that that's what's pled. And to me, it is sufficient to plead a causal connection at the motion to dismiss stage. And for that reason, I deny the motions to dismiss Counts V and VI with respect to JDs 1 and 4.

So then we'll go on to Count VII, intrusion upon seclusion.

MS. DONESKY: Yes, Your Honor. And this is where, you know, we had spoken in advance. I'm prepared to speak -- it would be Count VII through XII relating to the intentional and negligent torts for vicarious liability purposes on behalf of TNC. So if you -- which is a separate

piece of the briefing on that legal issue. So I will address that, and then Mr. Shaw's counsel will address the underlying torts themselves.

So with respect to the vicarious liability issue, Your Honor, this is a case pursued by five individually named current or former employees of The Nature Conservancy. TNC, as we've been referring to in short form this afternoon, is a nonprofit 501(c)(3) nature conservancy organization. Its mission is to help protect, restore the Earth's lands and waters upon which all life depends. TNC is global in reach with chapters organized and operated throughout the U.S. and beyond.

The particular chapter involved in this case is the Tri-State Chapter, which covers Minnesota, North and South Dakota. And the five individually named plaintiffs were employees of that chapter. One, as we've discussed already, remains employed with TNC to this day; and four other chose to leave TNC at various times.

I would like, for purposes of this argument, to direct the Court's attention to September 28th, 2022. And why that date? Because that is the date from which all the plaintiffs' claims stem, whether actionable, timely, or not.

It is on this date that TNC and plaintiffs themselves discovered for the first time that Doug Shaw, the Tri-State's then associate director, had, as the complaint

alleged, engaged in illegal actions, misused numerous photos by online posting of false and sexually explicit photographs and comments about several plaintiffs on a photo- and video-sharing social media site.

That social media site, Your Honor, is called Flickr. And Flickr is publicly described as a free ad-supported website that allows users to share photos and videos online. It's also a popular platform for organizational and storage of images. There are many ubiquitous types of social media sites that are out there today that can be used for various purposes, and Flickr just being one of those.

The manner, however, Your Honor, in which Mr. Shaw used that site on his time for his own purposes to alter, post and/or comment on photos was highly inappropriate. So much so that upon learning of these personal transgressions, TNC fired him the very next day. And that is undisputed.

The plaintiffs, however, in this case seek to hold TNC vicariously liable for Mr. Shaw's alleged torts, both intentional and negligent. But that, Your Honor, as a pure legal matter, is where plaintiffs' claims legally fail as to TNC.

The crux of plaintiffs' tort claims against TNC rests on a single conclusory allegation that Mr. Shaw was acting within the scope of his employment with TNC when he

altered, posted, and commented on photos about certain plaintiffs to Flickr.

Some of those purported photos are what's called -- known as deepfake photos, at least that's how it is alleged in the complaint, which Shaw allegedly altered and falsely attributed to two plaintiffs who had or did work at TNC. And those altered photos disturbed -- displayed sexually explicit images.

Your Honor, the notion that this sort of disgraceful personal conduct was somehow part of Mr. Shaw's job at TNC, a nonprofit environmental conservancy organization, suspends disbelief, which this Court is not legally required to do. And we know that because we have the *Miles* case from Judge Tostrud, and we also have the *Dollar -- Davis v. Dollar Tree* case from Judge Wright.

This is not an issue of fact that requires denial of the motion. In fact, *Miles* and *Davis* tell us otherwise, that this motion and this legal issue of vicarious liability can be decided now by Your Honor on this motion to dismiss. *Miles* tells us that and *Davis* tells us that, among others.

No discovery is warranted. And those cases, along with three or four others I will speak to, Your Honor, this afternoon about the legal analysis and circumstances of these other cases, the *Yath* case, the *Buckles* case are so similar in their facts and their analysis that it compels

dismissal as a matter of law now.

Let me speak to the *Miles* case. I know it is briefed at length in the briefing. Just to summarize it briefly for purposes of highlighting the most pertinent parts to that case as it relates to this legal issue here, that was a university classroom session held during COVID during which a recording of the plaintiff and the student, Jessica [sic] Miles, was participating. She went to the restroom at some point and was inadvertently still on camera, and that event was recorded.

Over a year later, a YouTube video was discovered which aired the restroom video from that classroom session. And it identified the plaintiff actually by name. The video went viral. It was viewed by millions of people. It even became the subject of Saturday Night Live parody.

Just like here, Ms. Miles sued the professor who -- he was alleged to have posted that video and the employer, Simmons University. Just like here, *Miles* raised a variety of tort claims against the professor and the university. And just like here, Simmons University immediately moved to dismiss itself on the basis that it could not be held vicariously liable for those actions by the professor in posting that restroom video on YouTube because it was unforeseeable and outside the scope of employment as a matter of law.

There, like here, Ms. Miles claimed it was a fact issue, couldn't be decided on a motion to dismiss. Judge Tostrud disagreed and made a detailed analysis of the opinion and said, No, this can be decided as a matter of law on this motion. And Judge Tostrud did.

And in so holding, Judge Tostrud held that the complaint did not plausibly allege that the professor's posting of that student's -- the restroom video would have been foreseeable to Simmons University.

It's notable --

THE COURT: Let me ask you this, though, because you were --

MS. DONESKY: Certainly.

THE COURT: -- drawing parallels to the *Miles* case.

MS. DONESKY: Uh-huh.

THE COURT: Were there any allegations in *Miles* that any of the challenged behavior was done while the defendant was working?

MS. DONESKY: Actually, what's notable in *Miles* is -- there are no allegations for Mr. Shaw in this complaint that he was working at the time. But, actually, in *Miles*, the Court did specifically address that and said that the professor worked from home and he was working from home at the time. In fact, he was working on the day in

question in the classroom setting when the source of the video took place.

But the Court understood and found where the line was drawn, at which point it was the posting -- the act of his posting that video to YouTube that was not made within the work -- the limits of work time and space. That's what the Court ultimately held was that the conduct of the professor's taking the recording, posting it to YouTube, was outside of the work limit space and time.

And that's exactly what you have here, Your Honor. The taking of photos at TNC, like many companies do for business purposes, the taking of the photos themselves is not the improper conduct. As the complaint states, it's the illegal actions and the misconduct and the altering, posting, and commenting of the photos. And those parallels draw exactly together in the very same way.

THE COURT: I think the facts are different here than *Miles* in some ways that really matter. There are allegations that support that, first of all, that photo taking was a part of Shaw's work duties. I'll kind of start there.

There are allegations that support that many of the photos were originally taken during work hours or at work functions.

There are allegations that support that the

misconduct would not have occurred but for Shaw's employment because he was able to access plaintiffs' social media profiles due to his position within TNC.

There are also allegations that reports and complaints had been made several times about his inappropriate conduct toward women at work, which plausibly support an assertion that his inappropriate posting and commenting was foreseeable.

There are also allegations in the complaint that TNC had a history of sexual harassment by men in positions of authority at the company which supports, again, the assertion of foreseeability.

And there is the allegation, as Shaw's boss stated, that there were several instances where Shaw's behavior during his tenure was inconsistent with TNC's guidelines on the ethical use of images.

And I find that these facts are critically different from those in *Miles*. In *Miles*, there wasn't any allegation that the defendant had demonstrated a tendency toward the behavior at issue. And *Miles'* primary argument was that the act was foreseeable based on defendants' policies in place. It wasn't the whole behavioral aspect as plead and alleged here. And we already had the discussion about to what extent the critical acts or conduct of the defendant took place while the defendant was working.

So I see those as facts that are distinct. And as pled in this case, for purposes of a motion to dismiss, there is enough there that to me isn't simply a matter of the conduct of Shaw, but what the allegations in the complaint go to is the suggestion of a kind of either silent complicity or a kind of imprimatur of the employer where this would have been foreseeable based upon how they dealt with concerns about Shaw or other men historically within the company.

So that, to me, changes the analysis of foreseeability as it's pled. Again, whether that will be borne out by the discovery, I don't know. And the issue can be revisited at summary judgment, but there certainly is enough there to have pled vicarious liability at the motion to dismiss phase; and for that reason, the motion to dismiss count -- those reasons, Count VII will be denied.

MS. DONESKY: And I would be more than happy to address all of what Your Honor said, but I understand that that's how you're ruling.

I presume that's -- are you ruling then for all the vicarious liability to -- because we have moved on vicariously liable for VII through XII.

THE COURT: That would be correct --

MS. DONESKY: Okay.

THE COURT: -- on vicarious liability.

MS. DONESKY: I will let counsel for Mr. Shaw address the underlying tort issues.

THE COURT: All right. So I'm assuming then, we will take up at Count IX. And you can lower that podium too. There's a button there. There you go.

Count VIII, which was appropriation, that Defendant Shaw did not move to dismiss that claim. And I've already given a ruling of vicarious liability with respect to TNC.

And so let's go to Count IX, false light.

MS. LEWENSTEIN: We had merits arguments on Count VII, which was the intrusion upon seclusion.

THE COURT: All right. You may proceed there.

MS. LEWENSTEIN: Okay. Intrusion upon seclusion occurs when an individual intentionally intrudes upon the solitude or seclusion of another or his private affairs or concerns.

The intrusion can be physical like peeping through someone's window, or it can be done through mechanical means, like wiretapping someone's phone, or through the senses, like eavesdropping on someone. Additionally, for there to be liability, the plaintiff must have had a legitimate expectation of privacy.

But regardless of how the tort is done, there must be an actionable intrusion, an affirmative act. And here

the dispute is whether plaintiffs have alleged an actionable intrusion. Plaintiffs concede that posting photos taken of them in public or reposting photos from Facebook are not actionable intrusions because there's no expectation of privacy in public or in publicly posted photos.

Instead, they argue that the intrusion -- that the Defendant Shaw intruded by using the photos to encourage discussion of the plaintiffs' private marital affairs and sex lives generally.

So plaintiffs want to create tort liability for discussing another person's marriage or sex life. Plaintiffs have cited no authority that mere discussion of a private topic constitutes an actionable intrusion. They seek to have the Court expand --

THE COURT: Doesn't the *Fletcher* case do just that, where the Court confirmed that employees can have an expectation of privacy in their private, romantic, or sex lives, and that their coworkers' discussions of such matters can constitute an actionable intrusion upon seclusion if seclusion is shown? Isn't that what the *Fletcher* case says?

MS. LEWENSTEIN: I disagree, Your Honor, that that's what the case says.

In *Fletcher*, the intrusion was the fact that the -- the employer had an unauthorized use of medical records release. The plaintiff authorized release of her

records for a workers' comp claim, but the defendant used the release to obtain records for an unemployment claim. And that was what the Eighth Circuit found was the intrusion.

The part of the opinion that related to coworkers discussing the plaintiffs' medical condition related to the reasonable expectation of privacy prong.  The Eighth Circuit held that despite the fact that there was an intrusion, the plaintiff didn't have a reasonable expectation of privacy because she had discussed her staph infection with coworkers.  So whether the coworkers' discussion, the mere discussion was an intrusion I don't think was at issue or discussed by the Eighth Circuit.

THE COURT:  Well, no, it sounds that what you said, that if the plaintiff had discussed such personal matters openly with coworkers, then they would be precluded from claiming solitude or seclusion because they discussed it openly with coworkers, not that it otherwise wouldn't have existed.

The whole premise was that there was no basis for such a claim when the plaintiff, him or herself, had already been discussing those types of matters with respect to themselves with others.  Implicit in that, however, were that not the case, then it doesn't preclude there being a right to an expectation of seclusion that ought not be

intruded upon.

MS. LEWENSTEIN: So I -- I think there's a difference between what is an actionable intrusion versus whether someone has a reasonable expectation of privacy in what's being intruded upon.

THE COURT: Well, suffice it to say, there are no allegations in this case that the plaintiffs discussed their romantic or sex lives openly with their coworkers, is there?

MS. LEWENSTEIN: No. And my argument is that -- that Mr. -- that defendants' alleged discussion of their marriage or sex lives isn't an actionable intrusion. It's just discussing -- it's the same thing as gossiping, and I think that would, you know, kind of drastically expand the tort if you could have tort liability for discussing someone else's private affairs.

THE COURT: Well, I think it also would have the *Fletcher* case not make a whole lot of sense if *Fletcher* stands for the proposition that such conduct, the conduct at issue in that case was not actionable because it had already been discussed by the aggrieved party with others. If there was no right to be protected that way in the first place and if it were not actionable *a priori*, then there would be no reason for the caveat and for the clarification that the Eighth Circuit made in *Fletcher*.

The Eighth Circuit could have just said, this is

not protected conduct, period.  And, instead, the Eighth Circuit was clear that there is no entitlement to protection in the context of those facts because the plaintiff had already discussed those private matters with others and put it out in the open.  But the Eighth Circuit didn't say categorically that there was no right to protection or there was no such thing as an intrusion upon seclusion, did it?

MS. LEWENSTEIN:  No, they said there was no -- they said there was an intrusion, it just wasn't into something that the plaintiff had a reasonable expectation of privacy in.

THE COURT:  All right.  I heard your argument, and, again, with respect to that claim under Count VII, that motion to dismiss upon intrusion upon seclusion is again denied.

MS. LEWENSTEIN:  Okay.

THE COURT:  So where do you want to go next?

MS. LEWENSTEIN:  False light, Your Honor.  False light is brought only by JD3.  And the false light claim hinges on whether Minnesota or South Dakota law applies.  South Dakota recognizes the claim; Minnesota does not.

The parties agree that Minnesota's five-factor choice of law test applies.  For the sake of brevity, those factors are outlined in the briefing, although happy to restate them if it would be helpful to the Court.

At least three factors favor application of Minnesota law, and the other two factors are neutral.

THE COURT: Let me just stop you there, in fact, because I think it's asserted and argued that there is no false light cause of action within Minnesota under Minnesota law.

MS. LEWENSTEIN: Yes.

THE COURT: All right. We're on the same page there.

MS. LEWENSTEIN: Yes.

THE COURT: All right. So let me stop you there for just a moment and let me talk to the plaintiff.

MS. LAWLESS: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. LAWLESS: Therese Lawless.

THE COURT: Yes. So I am making my assessments on the basis of what is, in fact, pled. And aside from the allegation that JD3 initially presented her charge of discrimination to the South Dakota Department of Labor and Regulation, to the Department of Human Rights there, I don't see any other facts alleged in the current complaint that JD3 resides or works in South Dakota or that any of the relevant conduct took place there.

So I don't see any facts in the complaint before me that even gets me to the choice of law analysis because

there isn't anything in the complaint that says properly South Dakota.  And on the basis of what I see in the complaint, I am inclined to grant the motion to dismiss because I don't see a choice of law issue being raised with respect to South Dakota based on the pleading.

MS. LAWLESS:  Yes, Your Honor.  I'll just point you to the portions of the complaint that do discuss South Dakota, and then what I'd also like to bring the Court's attention to is that we did seek leave to amend to allege the facts.

So the complaint at paragraph 2 and 20 states that plaintiffs worked in Minnesota and South Dakota.  And, in fact, that is where the current -- the currently employed plaintiff still works, JD2, in South Dakota.  And we have sought leave to amend to add that she and Shaw worked together in South Dakota primarily.  He would go into the field to South Dakota.  He took photos of her when they were in South Dakota.  JD3, excuse me, lived in South Dakota.  Shaw knew that plaintiff worked and lived in South Dakota.  These are the amendments, Your Honor.  You're right, all we said is, in paragraphs 2 and 20, that some of them -- you know, they worked in South Dakota, and you are correct.  So that's why we have sought leave to amend.

And with that leave to amend, I think we would satisfy the requirement.  And, in fact, if you really step

back and look at it, it's not like we asked -- we're not asking you, the judge, in Minnesota to apply Minnesota law to our South Dakota plaintiff. We're only asking that the Court acknowledge that there is false light, that we have met the requirements of false light for South Dakota. And as the complaint is currently stated and as we would like to amend it, it's plausible for sure.

THE COURT: But obviously in federal court, I can't engage in an advisory ruling of that sort. So the issue before me now is what law applies to the false light claim as pled based on what are the averments in the complaint. And I do hear what it is the plaintiffs would intend to do if given leave to amend, but it would require some kind of an amendment because as it's pled, it does not raise an issue that would require the Court to engage in an analysis of South Dakota law.

And for that reason, my inclination is to grant the defense motion, without prejudice, but to grant that motion. And I will talk about any requests for leave to amend at the end of the hearing.

MS. LAWLESS: Okay, Your Honor. I don't have anything further to say other than that on this particular claim.

THE COURT: All right. Thank you.

And then as a consequence, if I'm granting that

motion with respect to Shaw, I'm also granting it with respect to TNC. And so the motion to dismiss is granted without prejudice.

So next we'll take up defamation, Count X.

MS. LEWENSTEIN: Yes, Your Honor. So defendant moved to dismiss the defamation claim as it relates to Statements 1, 2, 5, and 6. And if we are focusing on what is pled in the complaint --

THE COURT: And we are.

MS. LEWENSTEIN: -- then I think based on what's pled in the complaint, Statements 1, 2, and 5 are not timely because they -- they state that they were posted in July 2016 for Statement 1, in August 2016 for Statement 2, and in late 2020 for Statement 5. And there is a -- so those fall outside the two-year statute of limitations in Minnesota.

THE COURT: So but what about the argument that plaintiffs assert that the comments were directed to a new audience in June of 2022?

MS. LEWENSTEIN: I think those are based on the facts that they seek to add to the complaint. But I'm happy to address that regardless.

THE COURT: No. Let's have the plaintiffs address it then.

MS. LEWENSTEIN: Okay.

MS. MCGRATH: Your Honor -- oh, sorry.

THE COURT: Pardon.

MS. MCGRATH: I thought you were about to ask me something. Sorry.

THE COURT: I was. I was. As I read the complaint and -- I saw and read about the redirection theory, which is not a theory that's pled in the complaint.

MS. MCGRATH: That is true.

THE COURT: So do you have anything more to say based on the language in the complaint, and you may well gather that I'm also inclined to grant this motion to dismiss as well based on what is pled in the complaint.

MS. MCGRATH: No, Your Honor, for Statements 1 and 2, it is entirely based on the redirection, so it would need to be amended.

And then I think I did state in the opposition that I made a typographical error with respect to Statement Number 5, and I will correct that. But it does erroneously say 2020 in the complaint.

THE COURT: Right. Well, then I will grant Shaw's and TNC's motion to dismiss to the extent they argue that the three statements identified are outside the statute of limitations, but without prejudice. That -- I'll again talk about the motion to amend process at the end of this. And Shaw's and TNC's motions to dismiss are otherwise denied;

but with respect to those three statements, they will be granted without prejudice.

MS. MCGRATH: Thank you, Your Honor.

THE COURT: All right. You feeling like you're on a roll?

MS. LEWENSTEIN: Well, I just want to clarify, we also moved on Statement 6 on separate grounds. Has that been decided, or would you like to hear argument on that?

THE COURT: I'll hear argument on that.

MS. LEWENSTEIN: Okay. Statement 6 is subject to dismissal because it's a nonactionable statement of opinion. The specific statement is, "JD3 is a gem. She also has a wild side." These are subjective descriptors, and they are regularly found to be statements that are incapable of being proven true or false, and I was just going to rely on the cases that have been cited in the briefing.

THE COURT: All right. Again, I will deny the motion to dismiss with respect to that claim. The statements are precise as to who they relate to. They could be verifiable through testimony and other evidence. And considering the social, literary, and public context in which they are made, they were made to infer as a matter of fact that JD2's fun relationship and JD3's wild side related to sexually promiscuous activity. So given the nature of the pleading, then I will deny with respect to that; and as

well again to the extent TNC had a vicarious liability claim, I've already addressed and denied that.

So do you want to move on to the intentional infliction of emotional distress, Count XI?

MS. LEWENSTEIN: Yes, Your Honor. And on this claim, I think Defendant Shaw had -- there were some overlapping arguments with Defendant TNC, but I think they had a few different arguments that were only in their brief. So for Defendant Shaw, based on what's pled in the complaint as it is, plaintiffs have not met their burden to plead -- plausibly plead severe distress.

The allegations in the complaint are conclusory. They say that they suffered a distress so severe that no reasonable person could be expected to endure it. That's just the definition of severe distress. It's the same thing as if they had pled, We suffered severe distress. That's a legal conclusion which the Court isn't required to give credence to on a motion to dismiss.

The other kind of statements, they plead mental distress, embarrassment, anger, disappointment, worry, significant emotional distress, severe emotional distress, those are all conclusory. And Minnesota Courts have held that there's a heightened standard to prove severe emotional distress. That heightened standard necessarily affects what a plaintiff must plead to withstand a motion to dismiss.

If, as a matter of law, embarrassment and depression cannot satisfy the severe emotional distress standard, then simply pleading it does not make the claim plausible.

THE COURT: All right. Thank you.

Let me hear from the plaintiffs because I think the defense is right, that this claim is too bald and just too bare an assertion of the elements. So what say you?

MS. LAWLESS: Your Honor, what say we is that we were seeking leave to amend, and we added the additional facts that we would seek to amend.

And I just want to point out, though, in their reply brief in the *Thomas* case that they cited, they said that it wasn't enough to plead facts such as the plaintiff had a burning chest, tearfulness and numbness. But that case was a summary judgment case, and the Court looked at the record and said, you made those allegations, but the record doesn't show it. So I think the facts that we have now set forth, that we need to amend our complaint and be in compliance with the Eighth Circuit and the other cases.

THE COURT: All right. Thank you, Counsel, with respect to that. I think on the complaint as pled, that motion to dismiss is granted without prejudice, but grant that as it's pled, it's insufficient to state a claim for intentional infliction of emotional distress beyond just the bare bones, and it doesn't really pass muster under *Twombly*

and *Iqbal* either.  All right.  So thank you.

Let's go on next to negligent inflection of emotional distress.

MS. LEWENSTEIN:  To proceed on a negligent infliction of emotional distress claim, a plaintiff must have been in a zone of physical danger.  Plaintiffs admit they were not in a zone of physical danger.  They seek to instead rely on an exception to this requirement, which some Minnesota State Courts have allowed, but which the Eighth Circuit has declined to follow.

Some Minnesota Courts have allowed an exception to the zone of danger requirement if the negligent infliction claim is bundled with an intentional tort such as defamation.  However, all the parties agree there's no controlling Minnesota Supreme Court opinion on this issue.  The controlling opinion is a Minnesota appellate court opinion.

All the parties agree that where there is no controlling opinion from the state's highest court, that Federal Courts should seek to determine how they believe the State Court should rule.  And in this instance, the Eighth Circuit has already done that analysis for us, and the Court is bound by that precedent.  And that is the *Yang v. Robert Half International* case.  That -- same procedural circumstances as this case.

At the District Court level, Judge Brasel dismissed plaintiff's negligent infliction claim on a motion to dismiss because the plaintiff was not in a zone of physical danger. Judge Brasel refused to recognize the zone of danger exception, and the Eighth Circuit affirmed. And I think the -- the *Yang* case was slightly misquoted in some of the briefing, so I just wanted to read the quote for the Court.

The Eighth Circuit --

THE COURT: Isn't there a simpler basis to decide this on given that plaintiffs have to allege that they were within the zone of danger, which you've been discussing --

MS. LEWENSTEIN: Yes.

THE COURT: -- reasonably feared for their safety; and then, three, consequently suffered severe emotional distress with attendant physical manifestations. I don't know that I saw any allegations of physical harm.

MS. LEWENSTEIN: No, Your Honor. And with the fact that the severe emotional -- the intentional infliction of emotional distress, since that claim -- since that -- our motion is being granted on -- for that claim, that would also apply that plaintiffs have not pled the emotional distress for their negligent infliction claim as well.

THE COURT: Right. I understand that plaintiffs seek leave to amend with respect to this count also; but,

again, focusing here just on what is pled.

MS. LEWENSTEIN: Yes.

THE COURT: If you want to finish your argument up for the record, you may. But I'm satisfied --

MS. LEWENSTEIN: Okay. Then --

THE COURT: -- which means you can sit down if you'd like too.

MS. LEWENSTEIN: I will. Thank you, Your Honor.

MS. LAWLESS: Your Honor, the Minnesota Supreme Court still recognizes the exception to the zone of danger. And we have cases that have said that. While the *Yang* Court said it was predicting that this would no longer be followed, nowhere do we have any cases that said the exception to the zone of danger no longer applies. So in this case, because we have defamation, we have willful, wanton, and malicious conduct, these are -- all fit within the exception --

THE COURT: And defamation would only apply to JDs 2 and 3?

MS. LAWLESS: Yes, Your Honor.

THE COURT: All right.

MS. LAWLESS: And then the willful, wanton, malicious conduct that we're saying that occurred throughout with other plaintiffs. And with our proposed amendment, we have alleged physical manifestations of the emotional

distress that we believe would meet the standard.

THE COURT: Right. Currently, as you heard, I found the need to have alleged a physical manifestation to be currently absent or not sufficiently pled. And without my getting entangled in the zone of danger at this stage, that would be grounds in, of, and by itself to grant the motion to dismiss, and so I will decide it on the least controversial basis at this point.

MS. LAWLESS: Which would be the physical manifestation, Your Honor?

THE COURT: That's right.

MS. LAWLESS: Okay. And that's exactly in the *Neppl* case that they cited in their reply brief, that there was no evidence of physical manifestation; and so we are able and willing to amend our complaint to allege that.

THE COURT: All right. Okay. Well, that -- the motion to dismiss here will be granted, again, without prejudice for both defendants.

MS. DONESKY: Your Honor, might I be heard briefly on vicarious liability for this particular count given that it's a negligent claim and there are some additional elements that I think while I understand Your Honor's dismissing without prejudice at this point, I believe on this point, the negligence higher standards provide a basis for --

THE COURT: It's true. However, let me hear from the plaintiffs. I take your point even before you made it, because I also don't see anything else in the -- that's pled with respect to the additional two factors that go to vicarious liability. And, again, for negligence-based torts, as in negligent infliction of emotional distress, there are two additional factors which counsel rose to address.

First, whether the conduct was to some degree in furtherance of the employer's interest; and then, second, the employee was authorized to perform the type of conduct, those two items. And I don't see allegations pled that support those two additional factors, and I think that's also grist for the plaintiffs' desired motion to amend mill. But do you want to speak to that?

MS. MCGRATH: I will just briefly, Your Honor.

Just with respect to the employee being authorized to perform the type of conduct, I think you addressed it previously. When we look at paragraphs 21, 26, 32, it was part of the course and scope of Mr. Shaw's duties to be taking photos of his employees during their work trips to the field; and that if you look at paragraph 10, from that, we can glean -- right? -- that TNC had a website and it had social media accounts. We know that because one of our plaintiffs had to scrub it with all mentions of Mr. Shaw.

And I think a reasonable inference there is the fact that Mr. Shaw's photos, which he took of TNC employees doing TNC activities, were regularly posted to the website and social media. And, again, I think it's a reasonable inference that the reason that TNC would have a website and social media was because there was some benefit inured to them from that, probably, you know, donor interest and that sort of thing.

So perhaps we could plead more specifically, but I do think that, you know, taking that we get all reasonable inferences, I actually do think that we have met the further -- the conduct is in some degree in furtherance of the employer's interests and that the employee was authorized to perform the type of conduct.

THE COURT: I'll hear from the -- from the defense; but to be clear, I'm not persuaded with respect to that -- those arguments, that the employee was authorized to perform the type of conduct at issue here. I think it's not, at this point, sufficiently pled. But let me hear from the -- from the defense.

MS. DONESKY: No. I think Your Honor is exactly right. I mean, those would be the arguments I'd make. And the additional requirements needed are as Your Honor said. It had to be -- you were talking about the misuse of a photo to an online social media account. There's no

allegations and I would submit not even possible to plausibly allege that it was to some degree in furtherance of TNC's interests or that in any way he was authorized to perform the type of conduct that's being challenged here, which is the misuse of the photos.

So we would submit that there is no ability to amend as to this issue on the negligent intentional infliction. The *Snilsberg* case supports that. Those additional elements make clear that the particular tortious conduct he is alleging cannot be alleged and cured. So we would submit that a dismissal with prejudice on those claims to TNC would be appropriate.

THE COURT: I'm going to come back to that in just a moment. But if you would stay at the podium --

MS. DONESKY: Yes.

THE COURT: -- I'm going to ask you to go ahead and address the negligent retention and supervision.

MS. DONESKY: Certainly. Yes, and the failing element there, Your Honor, is that plaintiffs must establish for those claims that there was physical harm. It requires the plaintiff to suffer physical injury or threat of physical injury. Emotional distress or mental anguish are not physical injuries for the purposes of this requirement.

So in addition to being preempted, which is the other ground that we moved on for this count to be

dismissed, the complaint fails to allege these necessary elements.

THE COURT: All right. Thank you. Now I'll hear from plaintiffs on both a response with respect to negligent infliction of emotional distress and Count XIII.

MS. LAWLESS: Ms. McGrath has given me permission to tell you that she doesn't have anything further to say about the negligent infliction of emotional distress, Your Honor --

THE COURT: All right.

MS. LAWLESS: -- except for the request for leave to amend.

THE COURT: Please proceed.

MS. LAWLESS: Okay. With respect to the negligent retention cause of action, at first, TNC argued that it was a requirement that the individual plaintiffs fear physical injury, but they conceded in their reply brief that's not true. And, again, we understand that we have to allege physical manifestations of what they have suffered and that is our intent to do.

Is there any other topic on that you would like me to address?

THE COURT: No. Nothing further on that. I'm just contemplating with respect to XII and XIII whether those should be dismissed with prejudice. And so -- but no

further argument needed.

MS. LAWLESS: Okay, Your Honor. I would just say -- okay. No further argument if you don't -- that's fine.

THE COURT: Unless you have something more you want to --

MS. LAWLESS: Yes, I just think that the whole idea of preemption here, it doesn't make sense in a case like this where we have the allegations that we have. And that you have -- often we have common law causes of action that are analogous or parallel to other claims, and the Court -- and we understand, for example, when we get to a jury, obviously the jurors are not permitted to give double damages; but oftentimes different claims go along parallel trails, and then, you know, there's a decision one way or another as to whether or not they are the same. But I think in this case, we are entitled, and as lawyers for our clients, to pursue these common law causes of action.

And, in fact, they tried to distinguish, I think, the *Vaughn* case; but the *Vaughn* case, they said that they could proceed with a violation of common law duty in addition to having a statutory claim.

THE COURT: All right.

MS. LAWLESS: Thank you, Your Honor.

THE COURT: I'm satisfied. With respect to

Count XIII, negligent retention and supervision, that motion to dismiss will be granted without prejudice. And it is not improper, if there isn't an outright preemption, to plead claims in the alternative. And it certainly doesn't mean both will go to the jury when all is said and done.

And I think preemption here is a close call, but I think plaintiffs have pled at least some facts that would support the negligent retention and supervision claim that are not as relevant to the MHRA claims. And so I don't find preemption.

But I nonetheless find that the plaintiffs' allegations don't support that TNC knew or should have known that Shaw posed a threat of physical injury. So on that basis, the motion to dismiss is nonetheless granted, and I'm just going to park the preemption issue.

MS. DONESKY: Your Honor, I think we might have one count, Count VIII, that I know Defendant Shaw joined through the briefing process. I'm not sure if we ended up discussing it specifically. If you --

THE COURT: All right. If you'd hold that for just one moment.

MS. DONESKY: Absolutely.

THE COURT: So focusing on Count XII, negligent infliction of emotional distress, I won't decide at this point the fundamental underlying question of zone of danger

that the parties briefed and were prepared to argue. And I granted the motion on the basis of the failure to have properly pled attendant physical manifestations. And so on that basis, the motion to dismiss is granted, but without prejudice. And there will remain an argument about zone of danger that we'll take up on the basis of a more fully developed factual record at some point.

So Count VIII was appropriation. And do you want to go back to Count VIII?

MS. DONESKY: Yes, Your Honor. I think that's just the -- we moved initially, I know Mr. Shaw joined it, but I think it would probably be proper since it was in our initial briefing to discuss it. The tort of appropriation requires appropriation to that person's use or benefit the name or likeness of another. And it requires the knowing appropriation of that name, likeness, or purpose to confer to the defendants' benefit some type of commercial or other value associated with that name or likeness. And that's what is lacking here. There's no benefit recognized here.

Shaw attributed photos to plaintiffs but their identities do not carry any specific, quote, prestige or reputation, social/commercial standing to which he would benefit. His only argument is that -- or their only argument was that sexual gratification and Shaw's own personal increased notoriety as the benefit; but as we

stated in the reply brief, that purported benefit really is unsupported by the case law recognizing these as benefits for this tort.

So as alleged, we would submit that the appropriation claim fails to plausibly allege this intentional tort and seek its dismissal.

THE COURT: All right. Thank you. Who wants to address this from the plaintiffs?

MS. LAWLESS: Your Honor, I guess Facebook would go out of business if it were all about commercial because everyone likes to get their likes; right? But with respect to this cause of action, the only obligation we have is to set forth the necessary elements of the claim, and they agree that a benefit need not be commercial. It only needs to be something that's cognizable. And increased notoriety and sexual gratification certainly fulfill this requirement.

Citing the case of *Faegre*, they relied -- that we relied upon, TNC also acknowledges that diverting traffic to a website in attempting to generate publicity are recognized as benefits. And the Restatement, excuse me, cited by TNC states that there are many benefits one can appropriate and misuse, including other values.

The likeness and images of young women on the internet or faces, beautiful faces, what people consider something, muscular, whatever, are certainly valuable as

evidenced by the commentary visitors often wrote on Mr. Shaw's site.

For example, set forth in paragraph 32 of the complaint, and excuse my language, after Shaw posted a photo of JD2 in a swimsuit and swim shorts using her real name and a commentator posted this remark, quote, That ass, though. Shaw responded that he added the commentator as a friend so he could see all the photos, including more of JD2, and hope you enjoy. Certainly Shaw was getting value from what he was doing.

THE COURT: Thank you.

I think the plaintiffs have alleged enough to show how Shaw benefitted from the appropriation. They do assert the use -- his use and benefits included his sexual gratification and his increased notoriety on a photo and video-sharing social media website.

And as to the issue of TNC's vicarious liability, my position there is the same as was addressed in response to Count VII on the issue of vicarious liability for what ties it to TNC for purposes of a motion to dismiss only. So that -- TNC's motion to dismiss there is denied on the issue of appropriation.

So a lot packed into the motion hearings today. Are there any open items? Any others that we have overlooked for any reason?

First I'll look to the defense. Anything further from the defense side?

MS. DONESKY: Nothing here, Your Honor.

THE COURT: And then for the -- and I'll ask the plaintiffs also, and I'll speak to the motion to amend in just a moment.

MS. LAWLESS: No, Your Honor.

THE COURT: All right. So to the extent the plaintiffs are looking to amend, I'm going to direct you to bring that in the form of a motion before the Magistrate Judge, where you seek leave to amend in front of the Magistrate Judge, and that way the Magistrate Judge will assess the merits of it and will apply whatever the standards are that apply; and out of which will come, I presume, an amended complaint of some sort, but I defer to the Magistrate Judge on that, but to take the issue up there.

It is the front end of this case, to the extent that a motion to dismiss is still the front end of a case, but it's one where I would certainly urge the parties to consider early resolution discussions. It is a case that is fraught with exposure, I think, on both sides. And I think there are good lawyers involved who I can see are going to litigate this case as zealous advocates. And you have done a great job on the briefing up to this point and the

presentation of the arguments.

But it is not too early for you to be contemplating resolution and having those discussions with the Magistrate Judge. I'll defer to you all to do it. I don't get involved in settlement discussions anymore since I started wearing the robe, and nobody has asked me since I started wearing the robe either to get involved in settlement discussions. And I will try it if you wish, but it would seem to be the case where reasonable lawyers can weigh the pros and the cons and have a discussion about what the vulnerabilities are on both sides, which I have a window into even now.

So is there anything further now for this afternoon? For the defense, is there anything further?

MS. DONESKY: Nothing here.

THE COURT: Plaintiffs?

MS. LAWLESS: No, Your Honor. Thank you for your time.

THE COURT: No, no, thank you all very much for your presentations and for your briefing. Court will stand adjourned.

THE COURTROOM DEPUTY: All rise.

THE COURT: Before I leave, I do just want to make clear and for the record that to the extent anybody is kind of waiting for a ruling from this hearing, the transcript

will be the record of this hearing.  So if you are looking for a record, just order the transcript.

All right.  With that, Court will stand adjourned.

(Court adjourned at 3:41 p.m.)

\*     \*     \*

I, Erin D. Drost, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

Certified by:  *s/ Erin D. Drost*

Erin D. Drost, RMR-CRR